HOLMAN *v.* STANDARD OIL COMPANY OF KENTUCKY, et al.

No. 42120          January 22, 1962          136 So. 2d 591

*Prewitt & Bullard,* Vicksburg, for appellant.

*Daniel, Coker & Horton,* Jackson, for appellees.

LEE, P. J.

This is an appeal by Mrs. James M. Holman from a judgment of the Circuit Court of Warren County which affirmed an order of the Workmen's Compensation Commission, denying her compensation benefits on account of the death of her husband, James M. Holman.

James M. Holman, at the time of his death, was 52 years of age. He had worked for the Standard Oil Company approximately 25 years. Immediately before his death, he had been driving one of the company tank trucks. He was stricken with a heart attack on August 8, 1959, and was hospitalized until August 27. The company filed the employer's first report of industrial injury, dated August 28, 1959, with the Commission, and also the surgeon's report, signed by Dr. Emmett C. Neill. The undated memorandum of agreement as to payment of compensation was signed by James M. Holman, W. F. Hallberg, Agent, and Travelers Insurance Company. The instrument showed that the first check, dated October 6, 1959, was for $280 as compensation from August 8, 1959 to October 3, 1959, at the rate of $35 per week,

and that compensation would be paid during disability on account of a heart attack while on the job, unless otherwise ordered. After Holman's death on October 15, 1959, compensation payments stopped.

■■ ■ On April 21, 1960, Mrs. James M. Holman, the widow, filed her claim with the Commission for death benefits on account of the death of her husband.

The attorney-referee began a hearing on July 8, 1960.

R. L. Sims, the company's plant manager, testified substantially as follows: The month of August was normally the busiest season of the year; and on Fridays, about one-third of the week's gasoline was sold and delivered. On Friday, August 7, 1959, Holman delivered eight loads of gasoline where normally he would have delivered four or five loads. The delivery of a load of such merchandise is a substantial task and involves considerable physical exertion. When Holman came in from work that evening, he told Sims, "Boy, I about burned up today. I think I got too hot. It was real hot."

The next morning Sims saw Holman after he had made one truck delivery. At that time he was perspiring and was wet with sweat. He was pale, was breathing hard as if he was choking or suffocating, and appeared to be sick. He complained of stomach and chest pains. Sims wanted to call a doctor or get an ambulance and send him to the hospital; but Holman though he would be all right in a few minutes. Shortly thereafter he left in his car to go home, and thereafter was taken to the hospital. The witness also testified that he visited Holman frequently while he was in the hospital, and that he saw him several times at home. At all times, Holman was complaining and apparently was making little improvement. When he saw Holman at the office on October 1, he was out of breath and could scarcely move around. He was still complaining of pain that day and said that it came and went whenever he overexerted himself. About 3:15 on the afternoon of October 15,

when Holman came to the office, preparatory to making a trip to Jackson, being the occasion of the company's giving a party for employees of 25 years and more of service, the witness advised him to let the doctor see him. Holman left and presumably saw the doctor. When he returned, and just before leaving for Jackson, he took a pill.

Mrs. Holman testified that, for several afternoons prior to August 8, when her husband had come home from work, he had told her that he was working awfully hard, and he appeared to be very tired, almost exhausted. She said that he did nothing whatever around the house. As he left the next morning, she did not notice that he was sick. After he got home from the hospital, he was weak and spent most of his time on the bed. If he walked from the front to the rear, he was exhausted. He complained of having pains in his heart at night. He was not able to participate in any of the usual community activities.

It was shown that he rode in an automobile, owned and driven by a Mr. Whitmire, and with Charles J. Hallberg on the trip to Jackson. They had gone into the lobby of the Robert E. Lee Hotel and had been there for only a few minutes when Holman fell over and died instantly.

The foregoing facts are without dispute.

Dr. Emmett C. Neill was called as a witness by the claimant. He described the symptoms of Holman when he was brought to the hospital for examination on August 8, and obtained a history of the case. He said that Holman had a myocardial infarction, a blockage of a coronary artery which results in the death of a heart muscle. The usual cause of such an attack is initially coronary artery disease, that is, atheromatosis plague. After stating the nature of the work which Holman was doing, and that it was arduous and the fact that it was a hot day, the lawyer asked if the doctor had an opinion as to whether

or not the activity on the previous day aggravated or contributed to the attack on the following day, and the doctor said, "Now, there is not a definite yes or no." His opinion was, "That it probably could have contributed to it." As to whether it was probable that he did, the doctor replied: "I don't think you can actually say that it probably did. I mean, it is very true that unusual physical exertion may precipitate an attack of myocardial infarction, but usually it is in people who are doing something they are not accustomed in doing * * * an unaccustomed physical activity." And again he said: "I think you have to say that it might well, and I'm trying to be perfectly honest about the thing, and I don't think anyone can say really." When his attention was again directed to the question of whether or not his employment and his activities on the day before contributed to his death, he replied: "Conceivably — I mean, it is possible." The man died nine weeks and five days after his admission to the hospital. The doctor then made several observations, namely: While the usual time to return to work is three months, this is not inflexible; and also, physical activity by one who is suffering from a deterioration of the arteries of the heart does "probably" have an effect on the condition. He said it would not be advisable to engage in a physical activity of the type Holman engaged in the day before his first heart attack. Then he was asked: "If, before having the coronary attack, he engaged in the increased activity on the previous day, do you have an opinion as to whether or not that activity probably aggravated, precipitated, or contributed to the occurrence of the attack?" The doctor replied, "It may have. It may well have."

On September 14, 1960, there was a hearing at which the details of the trip from Vicksburg to Jackson, and the circumstances at the time of the death were given. At the end of this hearing the employer and carrier

moved for the dismissal of the claim because "there is no medical testimony in this case to support a finding of causal connection between the employment of Mr. Holman and his untimely death on October 15, 1959."

On September 15, 1960, the attorney-referee sustained the foregoing motion and ordered that the claim "be and the same is hereby dismissed."

On November 23, 1960, on a review of the attorney-referee's order, the Commission was "of the opinion that the defendants herein should be and they are directed to put on their proof in the matter", and the cause was remanded to the attorney-referee for further proceedings in accordance with that opinion.

Thereafter, on February 9, 1961, the Commission entered an order, reciting that theretofore, the defendants notified the Commission that they did not desire to introduce further testimony, and that the matter was placed before the Commission for a review of the attorney-referee's order. Whereupon, the order was affimed; and on appeal, the circuit court likewise affirmed; and the claimant has appealed to this court.

If there is anything that seems to be settled in the field of medicine, it is that a myocardial infarction does not suddenly happen to a healthy individual who is without coronary artery disease. It is conditioned upon, and flows from, that disease. Dr. Neill said that: "The individual must have initially coronary artery disease — underlying disease, in other words, or atheromatosis plague." Besides, when one has suffered such an attack, in all probability, another will come eventually. Undoubtedly Holman was afflicted with this disease for sometime previous to the attack. The record is silent as to the extent of its progress. The doctor said it is true that "an unaccustomed physical activity" may precipitate an attack of acute myocardial infarction.

When it is borne in mind that Holman's work was heaviest during the month of August; that his work on

Fridays was almost twice as heavy as on the other working days; that on Friday, August 7, he had delivered eight loads of petroleum products as compared to a normal day of four or five loads; that it was a hot day; that, when he came in from work, he told the manager, "Boy, I about burned up today. I think I got too hot. It was real hot"; that he appeared to be very tired and exhausted when he got home—then undoubtedly it must be said that he had engaged in "an unaccustomed physical activity", namely unusual physical exertion. Then, upon his return to work the next morning and the delivery of one load of merchandise, he had all of the earmarks of a serious physical condition which, shortly thereafter, was found to be a heart attack. If "unusual physical exertion" or "unaccustomed physical activity" may ever aggravate, precipitate or contribute to the occurrence of a myocardial infarction, then undoubtedly to the lay mind it is most probable that Holman's work experience of August 7, with his coronary artery disease, or atheromatosis plague, accelerated the progress of that disease, and the work the next morning served as the trigger to explode that condition into a severe heart attack.

The doctor must have though that he should not express a definite opinion as to what occurred unless he could be absolutely certain that he was right and that he could prove his diagnosis beyond doubt. He appeared to be scrupulously honest. But he perhaps demanded of himself a greater intelligence and knowledge than human beings may possibly attain. Although his first replies evidenced doubt as to the probability of causal connection between the work and the attack, when, after explaining that "unusual physical exertion" or "unaccustomed physical activity" may precipitate such an attack, and when he was faced with the imponderable fact that Holman had done almost twice as much work the day before as he was accustomed to do, then it was,

when asked if such activity "probably aggravated, precipitated or contributed to the occurrence of the attack", he said, "It may have. It well may have." Obviously, if such activity, in the opinion of this conscientious doctor "may have", or "it may well have" precipitated such attack, then there was medical evidence of a reasonable probability that it did so.

With all of the undisputed facts, the need for conclusive confirmation by medical findings in this case is not a condition precedent to the award of compensation benefits. Conceding that the answers of the doctor are conflicting, at any rate, they do substantially corroborate the overwhelming lay proof of causal connection between the work and the attack.

Actually Holman suffered the heart attack while he was on the job, following the delivery of a load of petroleum products.

In the recent case of Russell v. Sohio Southern Pipe Lines, Inc., 236 Miss. 722, 112 So. 2d 357, this Court said: "It has been heretofore recognized by our decisions that there is a presumption of a casual connection between the employment and the injury or death when the onset of a heart attack occurs while the employee is about his work and engaged in the duties of his employment, and that the fatal consequences arise out of and in the course of the employment." See also Dunn's Mississippi Workmen's Compensation, 1960 Supplement, Sec. 54, P. 26, where the author says: "In the more recent cases, the presumption of causal connection, arising out of the fact that an attack occurs on the job, has increased in judicial favor to the point that it has shifted the burden of proof to the defendant and has assumed the dual effect of an inference of such strength as to require an award, as a matter of law, despite conflicting medical opinions or the absence of medical corroboration." Compare the cases there cited as documentation of the above principle.

When the question of causal relation is settled, the balance of the problem is easy of solution. The decedent had never recovered from his injury. Although he had given some evidence of improvement, the doctor had not advised him to return to work. He was not able to work and was not working. He was merely convalescing. The doctor said that one in that condition has death hanging over his head and may die at any time. The relentless blow of the first attack was inexorable, and Holman was unable to recover from it. Besides he had done nothing to aggravate his existing affliction.

Repeatedly this Court has held that the Workmen's Compensation Law "should be broadly and liberally construed"; that "doubtful cases should be resolved in favor of compensation"; and that "the humane purposes the act seeks to serve leave no room for narrow and technical construction." Ingalls Shipbuilding Corporation v. Howell, 221 Miss. 824, 74 So. 2d 863; Central Electric Power Association v. Hicks, 236 Miss. 378, 110 So. 2d 351, and the cases there cited.

The claimant made out a prima facie case. Since the defendant refused to offer any evidence, the Commission should have awarded compensation.

The cause is therefore reversed, a judgment will be entered here for the award of compensation benefits to the claimant, and the cause will be remanded to the Commission for the purpose of carrying out the judgment.

Reversed and judgment here for the appellant and remanded to the Commission.

*Arrington, McElroy, Rodgers and Jones, JJ.*, concur.